UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER 15-0036 |
| VERSUS | * | JUDGE S. MAURICE HICKS |
| BILLY J. ADCOX, JR. | * | MAG. JUDGE KAREN L. HAYES |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 32] filed by defendant, Billy J. Adcox, Jr. For reasons explained below, it is recommended that the motion be DENIED.

### Background

At 7:00 a.m. on the morning of March 27, 2014, two FBI special agents, Maurice J. Hattier, Jr., and Billy J. Chesser, knocked on the front door of Billy Joe Adcox, Jr.'s ("Adcox") home in Vienna, Louisiana. Upon opening the door, the agents advised Adcox that they were seeking his cooperation in an ongoing criminal investigation being conducted by a federal grand jury in Baton Rouge, Louisiana. Adcox invited the agents in and they all sat down around the dining room table. The agents questioned Adcox for the next one hour and forty-five minutes about his knowledge of, and involvement in certain stock market trades of the publically traded company, Shaw Group, Inc ("Shaw") in July 2012, around the same time that Shaw was in merger talks with another company.

According to Agent Hattier, Adcox eventually admitted that his good friend, Jesse Roberts, advised him to buy stock in Shaw based on insider information that Roberts had received from Roberts' brother-in-law and Shaw employee, Scott Zerinque. Adcox then

forwarded the tip to at least one other person. Adcox admitted to the agents that he netted approximated $40,000 from his trading activity in Shaw stock and options.

On March 4, 2015, a federal grand jury returned a two count indictment against Adcox for securities fraud (insider trading), and conspiracy to commit same, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 371. *See* Indictment. On January 29, 2016, Adcox, via counsel, filed the instant motion to suppress any incriminating statements made by him during the March 27, 2014, interview on the grounds that the agents obtained his statements involuntarily through material misrepresentations, trickery, and deception. Following delays for an April 28, 2016, hearing, the matter is now before the court.

## Relevant Testimony and Documentary Evidence

Two witnesses testified at the hearing: Special Agent Maurice Hattier[1] and Adcox's wife, Sara Adcox. Defendant introduced the single exhibit accepted into evidence: an FBI form FD-302 drafted on April 4, 2014, by Agent Hattier that memorialized the agents' March 27, 2014, interview of Adcox.

The court summarizes pertinent testimony and evidence, as follows.

a) <u>Pertinent Chronology and Substance of the Interview</u>[2]

On the morning of March 27, 2014, at 7:00 a.m., FBI Special Agents Hattier and Chesser

---

[1] Special Agent Hattier is a veteran FBI agent with almost 20 years of service with the agency. He is a certified public accountant, with experience in financial related crimes, including investment fraud, insider trading, and public corruption. However, the instant investigation represented his first insider trading case. Over the years, Agent Hattier has conducted hundreds, if not thousands of interviews.

[2] Agent Hattier testified that, in drafting the FD-302, he tried to document the interview in sequence of events. Because the FD-302 was drafted only one week after the interview, the court follows its chronology here.

knocked on the front door of Adcox's residence. Adcox answered the door.[3] The agents identified themselves to Adcox, explained why they were there, and asked to speak with him. Adcox invited the agents into the home. The agents advised Adcox that they:

> were seeking his cooperation in relation to an ongoing criminal investigation being conducted by a federal grand jury in Baton Rouge, LA. Adcox was admonished that, although he was not a subject of the investigation, if he chose to answer questions, it was very important for him to be completely truthful in his responses. Adcox was further admonished that any untruthful responses could cause him to have problems in connection with the ongoing investigation. To stress the importance of his truthfulness during the interview, Adcox was informed that his responses would be related to the prosecutor assigned to the case, and that some or all of his information could be presented before the grand jury. After these admonitions were completed, Adcox responded that he fully understood and that he was willing to continue the interview.

(FD-302; Def. Exh. 1).

The agents conducted the entire interview while seated at a dining room table across from the home's kitchen area. Adcox's two minor children remained asleep in their bedroom(s) throughout the encounter.

The agents initially exchanged pleasantries with Adcox, during which time he disclosed that he was a pharmaceutical sales representative. Adcox appeared to be in his 40s. The agents then queried Adcox about his trading practices and experience generally, before moving on to Adcox's purchase of Shaw shares and options, in particular.

Adcox initially attributed the timing of his Shaw purchases to good fortune. He maintained that he did not discuss his Shaw trading activity with anyone else, and that he was not aware of anyone else who may have purchased Shaw stock or options. When pressed by the agents to be truthful, Adcox stood by his initial responses.

---

[3] According to Sara Adcox, when she and her husband heard the knock on the door, they were awake, but still in bed.

At this point, Sara Adcox entered the room and sat down.[4]  For Ms. Adcox's benefit, and as another reminder to Adcox, the interviewing agents repeated their earlier admonishment that,

> Adcox was not a subject, but that he could cause himself to have serious issues in relation to the criminal investigation if he was untruthful in response to any questions.  Adcox was again reminded that some or all of his information would be relayed to a federal grand jury in Baton Rouge.[5]  Adcox was told that the interviewing agents already knew the answers to many of the questions that were being asked and that the interview was being conducted, in part, to ascertain whether Adcox would be honest.  For instance, based on an analysis of phone records, the interviewing agents already knew who Adcox was talking to on and around the dates he traded in Shaw.
>
> Adcox was informed by the interviewing agents that, up to this point in the interview, they did not feel like he had been completely honest.  For instance, the agents were aware that Adcox had spoken to other individuals about his Shaw trading activity.  Further, the agents were aware that Adcox traded in Shaw because he had received material, non-public information about Shaw from those other persons.  Adcox was reminded that, although honest responses might be difficult because they could implicate close friends and family members, continuing to lie could potentially cause greater problems for himself.
>
> It was in this context that the interviewing agents told Adcox that they were already aware of Jesse Roberts.  Adcox was thereafter specifically asked to explain the involvement of Jesse Roberts in his decision to buy Shaw.

(FD-302; Def. Exh. 1).[6]

Adcox then admitted that Jesse Roberts, his good friend, had told him to buy Shaw.  He further admitted that he made $40,000 in his stock and options trading in Shaw.  Nevertheless,

---

[4] Ms. Adcox estimated that she joined the conversation about ten minutes after the interview began.  According to Agent Hattier, Ms. Adcox sat down during the latter part of the first half of the conversation.

[5] Sara Adcox did not recall the agents mentioning "grand jury" or "prosecutor" during the interview.

[6] Ms. Adcox did not hear the agents tell her husband that he had not been fully honest with them.  She also did not hear her husband tell any lies.  She admitted at the hearing, however, that she had no independent knowledge of the veracity of the statements made by her husband.  Rather, she relied on his representations that he provided to her after the agents left.

Adcox continued to maintain that Roberts did not disclose to him the source of his information. Adcox also forwarded the information he had received from Roberts to his father-in-law.

When the agents asked Adcox why he repeatedly lied to them, Adcox replied that it was because he did not want to get anyone in trouble. Agent Hattier documented that,

> [d]uring the course of the interview, Adcox inquired on several occasions what the investigation meant for him. Each time when he asked this question, Adcox was always reminded by the interviewing agents that, if he chose to answer questions, the most important thing for him to do was to be completely honest in his responses. Adcox was informed by the interviewing agents that he had committed a violation of the law by trading in Shaw stock and options based upon material, non-public information. Despite this, the FBI was more interested in his honesty and cooperation against other subjects of the investigation. By offering lies, however, Adcox could be creating a situation in which he could be potentially prosecuted for making false statements and obstructing the grand jury.
>
> Adcox was informed on several occasions throughout the interview that the FBI, as an investigative agency, conducts interviews and gathers evidence of potential criminal activity. It was explained to Adcox that ultimately, all prosecution decisions on this matter would be made by the U.S. Attorney's Office in Baton Rouge. The FBI would merely have input into that decision. At some point midway through the interview, Adcox made inquiry as to whether he should consult with an attorney. In response, the interviewing agents stated that was a decision for him and his family to make and that the agents were in no position to give him advice either way. Adcox was reminded that this interview and his cooperation were voluntary, and that he was free to discontinue the interview at any time. Adcox thereafter decided to continue with the interview.

(FD-302; Def. Exh. 1).[7]

The agents then told Adcox that they were aware of the person with whom Roberts had been talking to around the time of the Shaw trading activity. After conveying their understanding of the difficult position that Adcox was in because of the involvement of his friends and family,

---

[7] Ms. Adcox testified that she did not feel like she needed to stop the conversation at any time. At no time during the interview did she feel like it was necessary to talk to a lawyer. She did not feel like her husband was guilty of anything. She remained quiet throughout the interview, and did not interject.

Adcox finally admitted that Roberts' source for the information about the Shaw sale/merger was Roberts' brother-in-law, Scott Zerinque. Moreover, Adcox knew that Zerinque was employed at Shaw and that he would be privy to this type of insider, non-public information about Shaw's sale.[8]

Toward the end of the interview, the agents asked Adcox for permission to review his cell phone for the text conversation between himself and Roberts. Adcox agreed and asked Ms. Adcox to retrieve the phone from their bedroom. Adcox pulled up the text message conversation with Roberts on the cellphone and handed it over to Agent Hattier, who scrolled through the messages and read them out loud.

The agents then asked Adcox for his consent to make an image of his cell phone data. Hattier told Adcox that he had someone on standby in Monroe who could come over and make a copy of the phone's contents.[9] Adcox demurred, however, stating that he wanted to speak with someone first before acceding to the request. The agents warned him not to delete anything from the phone. They left a consent form with Adcox.

At the conclusion of the interview, the agents served Adcox with a subpoena requiring his appearance on April 23, 2014, before the federal grand jury in Baton Rouge. Adcox again asked what the investigation meant for him. The agents told him that although he had lied initially, he ultimately had taken a step in the right direction. The agents were hopeful that his cooperation would continue. The agents further advised Adcox that although he had traded and profited on insider information, the investigation was more focused on other individuals who had profited

---

[8] Ms. Adcox disputed that her husband made this statement.

[9] Ms. Adcox did not recall that the agents offered to send someone to their home. She and her husband were concerned about relinquishing custody of the cellphone because they did not know when it would be returned to them.

more greatly.

Within one hour after the agents' departure, Adcox telephoned Hattier and told him that he still was thinking about allowing Hattier to make a copy of his phone's contents, and that he would let him know. Adcox eventually turned his cell phone over to the government.

b)  <u>Agent Hattier's Thought Processes and Ruminations</u>

According to Hattier, in 2014, the FBI was investigating allegations that individuals had conducted suspicious trading activity shortly before the public announcement in 2012 that the Shaw Group was being sold to another company. The FBI conducted the investigation in conjunction with the Secret Service and the Internal Revenue Service.

Agent Hattier decided to interview Adcox because they were aware that Adcox had had telephone communications with Jesse Roberts around the relevant time frame, and had traded in Shaw stock/options using his own brokerage account. Hattier suspected that Adcox had traded on inside information. Accordingly, he wanted to talk to Adcox to understand his involvement in the activity, and to gain his cooperation in the ongoing investigation. To be considered cooperative, Adcox would have had to be honest about his own activity and have disclosed his knowledge about others. Hattier had seen the communications, but he did not know what they were talking or texting about. He hoped to develop this information during the course of the interview. Hattier acknowledged that by responding honestly, Adcox also would incriminate himself.

The agents wanted to learn from Adcox what Jesse Roberts had communicated to him, and whether Adcox knew the identity of the insider who had provided the information. Before meeting with Adcox, Hattier did not believe that they had enough information for him to be charged by the grand jury because they did not know the substance of the communications

between Adcox and Roberts.[10]  At the same time that Hattier and Chesser interviewed Adcox, other teams had fanned out to interview seven other individuals.

Hattier assured Adcox that he was not the focus of the investigation.  Indeed, that was Hattier's personal belief – going into the interview.   Instead, Hattier believed that Roberts and Zeringue were the primary targets.  Hattier thought that Adcox could supply necessary information to build the case against Roberts and Zerinque.  Hattier told Adcox that they were more focused on Roberts and Zerinque.

Hattier did not believe that he lied to Adcox about Adcox not being the subject of the investigation because at the time, it was true.[11]  In retrospect, Hattier conceded that he could understand where Adcox might have thought that if Adcox were honest with the agents, then he would not be prosecuted.  If so, however, Hattier maintained that Adcox should have asked some follow-up questions.[12]

Hattier did not believe that he misled Adcox about his status in the criminal investigation. He also did not tell or promise Adcox that he would not be prosecuted.  He did not tell Adcox

---

[10]  Prior to the interview, Hattier did not recall having had any formal discussions with the U.S. Attorney's office about whether to prosecute Adcox.

[11]  Hattier admitted that he fibbed, however, when he suggested to Adcox that he already knew the answers to *all* of his questions.

[12]  For instance, *if* Adcox had sought clarification from Hattier as to whether he would receive immunity in exchange for his truthful statements, Hattier would have replied with his standard spiel that such decisions are made by the U.S. Attorney.
In his preparation for the hearing, Agent Hattier apparently told the Assistant U.S. Attorney that he *had* made a promise to Adcox.  In retrospect, however, Hattier explained that he meant from Adcox's perspective, he could see where he thought that a promise had been made. Nonetheless, that was not Hattier's mindset at the time of the interview.  Hattier's intention was to obtain Adcox's cooperation in the investigation against others.

that he had a deal with the government or the prosecutors. Hattier also never told Adcox that he had no criminal exposure. In any event, Hattier emphasized that Adcox had not been completely honest from the beginning of the interview.[13]

At one point, Hattier told Adcox that, in his opinion, he had committed insider trading. Hattier qualified that statement, however, by explaining that they still were interested in Adcox's honesty and cooperation going forward.

Hattier testified that Adcox appeared perfectly capable of understanding the interview process. He also appeared to understand the distinction between the FBI and the U.S. Attorney regarding who makes prosecutorial decisions. Adcox seemed like a smart, articulate, mature, individual. Adcox obviously was concerned. Nevertheless, the tone of the interview remained professional, calm, and conversational. Hattier never raised his voice throughout the interview.[14] Adcox remained attuned and very much interested in the conversation. He appeared to be well-educated, and in good physical shape. Hattier discerned no issues with Adcox's mental health. The agents never placed any restrictions on Adcox's freedom to take a break, use the bathroom, or obtain a drink of water. He never told Adcox that he was not free to leave or end the interview.

Hattier did not brandish his weapon or displayed handcuffs. The agents were dressed in suits. He also never threatened Adcox, other than his admonition that if he continued to lie, it could cause him greater issues.

---

[13] Adcox twice denied talking to anyone about his Shaw trades. Hattier believed that Adcox's value as a cooperating person had been damaged by his lack of honesty. Hattier issued several warning to Adcox about the importance of telling the truth because each time he lied, he was hurting himself and compromising his usefulness as a cooperating source.

[14] Hattier explained that they were sitting across the table from Adcox, so it was not necessary for Hattier to raise his voice.

Additional discussions were held between the U.S. Attorney's office and Adcox about his status. Ultimately, Adcox opted not to cooperate with the investigation.

c)   Sara Adcox's Recollections and Impressions

Ms. Adcox did not believe that the agents were there to investigate her husband. The agents stated that they already knew everything, and that they just needed Adcox to cooperate. She recalled that the agents assured Adcox several times that he was not a subject of the investigation; they just needed his cooperation. She did not feel like the agents ever shifted their focus to Adcox. She thought that the focus remained on Jesse Roberts.

Ms. Adcox confirmed that the interview was not heated or confrontational. Her husband did not appear alarmed. She agreed that the agents did not raise their voices or otherwise threaten him. She thought that the visit was to gather information, not an interrogation. In her view, the agents just needed her husband as a witness "or something."

Her husband chose to answer the agents' questions and tried to cooperate. Adcox did not have any legal training. Even after the agents left, she and her husband thought that, at worst, he would have to testify against Jesse Roberts.

## Law

The admissibility of pre-indictment confessions is regulated by both the Fifth Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause"). The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ." U.S. CONST. AMEND. V.[15] In addition, a criminal defendant is "deprived of

---

[15] The prophylactic protections required by *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) are inapplicable in this case where defendant plainly was not in custody

due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Lego v. Twomey*, 404 U.S. 477, 483-484, 92 S.Ct. 619, 623- 624 (1972) (citations and internal quotation marks omitted). The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*. The sole purpose of the hearing is to determine whether the confession was coerced. *Id*.

The government must establish by a preponderance of the evidence the voluntariness of a defendant's incriminating statement. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986); *Lego, supra; United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir.1996). The voluntariness of a waiver contemplates two distinct dimensions:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citation omitted).

At a earlier point in time, the Supreme Court held that a confession may not be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *United States v. Munoz*, 979 F.2d 1533 (5th Cir. 1992) (citing *Bram v. United States,*

---

when he made the statements at issue. *United States v. Dalton*, 465 F.2d 32, 35 (5th Cir.1972).

168 U.S. 532, 542-43 (1897)).  The rule now is less rigid.  Courts are called upon to determine whether an officer's comments cross the line between expressions of sympathy and kindness on the one hand versus promises of leniency on the other.  *Munoz, supra* (citations omitted).  Courts also need to distinguish between an improper promise and a permissible prediction about future events that is  beyond the parties' control or regarded as inevitable.  *Id*.  Moreover,

> the fact that certain promises may, or may not, have been made by law enforcement to secure the confession are not the sole determinant factor the courts evaluate in determining whether the confession will be upheld, for [t]he Constitution does not prohibit every element which influences a criminal suspect to make incriminating admissions.  Consequently, a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.

*United States v. Santiago*, 410 F.3d 193, 202-03 (5th Cir. 2005) (internal quotation marks and citations omitted).

Indeed, the existence of a promise constitutes but one factor in the totality of the circumstances analysis, and does not render a confession involuntary *per se*.  *United States v. Fernandes*, 285 Fed. Appx. 119, 124 (5th Cir.2008) (citing *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir.1988)).  Similarly, "trickery or deceit is only prohibited to the extent that it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *United States v. Bell*, 367 F.3d 452, 461 (5th Cir.2004) (citing *inter alia*, *Soffar v. Cockrell,* 300 F.3d 588, 596 (5th Cir.2002) (en banc)).  Furthermore, encouraging a suspect to tell the truth or telling him that his cooperation will be made known to the court does not suffice to render a subsequent incriminating statement involuntary.  *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978) (citations omitted).

Finally, in *Connelly*, the Supreme Court clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

Due Process Clause . . . " *Connelly, supra*. Thus, after *Connelly*, a confession will be rendered involuntary only if it results from, and is linked to coercive police conduct. *Bell, supra*.

## Discussion

The court finds that Agent Hattier did not *directly or explicitly* promise leniency or immunity to Adcox, in exchange for Adcox's truthfulness or cooperation. Furthermore, Hattier truthfully disclosed to Adcox that he was not the focus of the investigation – *at that time*. Rather, the agents were trolling for bigger fish, namely Roberts and Zeringue. Hattier hoped to obtain Adcox's cooperation in the government's case against these other individuals. At the hearing, however, Hattier candidly admitted that by providing useful information against Roberts and Zerinque, et al, Adcox necessarily would have to incriminate himself. Furthermore, by incriminating himself, Adcox would be providing prosecutors with leverage in their efforts to preserve his cooperation going forward. Needless to say, Hattier did not disclose these additional details to Adcox before commencing the interview.

On the other hand, Hattier advised Adcox that it was his choice whether to answer questions or not. Furthermore, if he *did* elect to answer questions, it was important for him to respond honestly. Adcox opted to answer the agents' questions, but, on more than occasion, denied any third-party influences or knowledge in his decision to purchase Shaw stock/options. If this was untrue, as his later statements suggest, Adcox potentially made a false statement to an FBI agent in violation of 18 U.S.C. § 1001(a)(2).

In an effort to prompt Adcox's cooperation, Agent Hattier advised Adcox that the agents did not feel that he had been completely truthful up to that point. They told him that they were aware that Adcox had spoken to other individuals about his Shaw trades and that he had traded in

Shaw because he had received material, non-public information about Shaw from these other individuals.[16]  In other words, the agents advised Adcox that they believed that he potentially had committed a crime.[17]  Although the agents may have exaggerated the extent of their knowledge, they already possessed phone and trade records which suggested that a possible crime had been committed.

The agents assured Adcox that, his transgressions notwithstanding, the FBI remained *more* interested in his honesty, together with his cooperation against the other subjects.  Because of the agents' repeated assurances that the focus of the investigation was on others, and the agents' attempts to enlist Adcox's cooperation in those efforts, Adcox undoubtedly hoped for leniency in exchange for his disclosures.  However, he could not, in good faith, expect more than that.  The agents offered no guarantees or explicit promises.  In fact, on the several occasions during the interview that Adcox sought to clarify his status, Agent Hattier advised him that prosecution decisions remained the province of the U.S. Attorney; the FBI could only provide input into those decisions.  Moreover, the FD-302, which the agents undoubtedly provided to the prosecutors, documented the nature and extent of Adcox's cooperation.  In other words, Agent Hattier upheld his end of any implied bargain.  Furthermore, according to Agent Hattier, Adcox ultimately decided not to cooperate with the prosecution, thereby negating the basis for any claim for leniency.

In addition, by all appearances, Adcox was intelligent and educated, with the requisite

---

[16]  Whether the government has alleged all of the elements of the alleged crime(s) committed by Adcox is the subject of a pending motion to dismiss [doc. # 20].

[17]  The court rejects Ms. Adcox's testimony insofar as she intimated that her husband was unaware of his potential criminal liability until sometime after the interview.

knowledge to execute his own on-line stock and option trades. The agents never raised their voices, or exerted any emotional or physical pressure for Adcox to respond to questions. In fact, they advised Adcox that it was his choice whether to answer their questions or not. Even Ms. Adcox characterized the encounter as an "interview," rather than an "interrogation." Adcox's statements were not the product of coercive police conduct. *See Fernandes, supra*.

Upon consideration of the totality of the circumstances, the undersigned finds that the government has demonstrated by a preponderance of the evidence the voluntariness of defendant's incriminating statement(s).[18]

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 32] filed by defendant Billy J. Adcox be DENIED.

---

[18] In support of his motion, defendant invoked several cases which are inapposite and/or non-binding. For instance, in *United States v. Rogers*, the court suppressed defendant's statements made to federal agents because, one day earlier, sheriff's deputies point blankly told defendant that he would not be prosecuted if he cooperated. *United States v. Rogers*, 906 F.2d 189, 190 (5th Cir.1990). In suppressing defendant's subsequent statements to federal agents on related charges, the court stressed that the defendant did not have the requisite intelligence to discern the difference between state and federal prosecutions. *Id*. Those circumstances are not present here.

In *United States v. Tweel*, the court suppressed evidence where IRS agents – known to the suspect to be IRS agents empowered to conduct *civil* audits – abused the voluntary civil tax reporting and investigation system by inducing the suspect to turn over records for a *criminal* investigation. *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977). The *Tweel* rationale, however, does not extend to cases where the defendant is interacting with someone whom he knows to be a criminal investigator conducting a criminal investigation. *United States v. Andrews*, 746 F.2d 247, 250-51 (5th Cir.1984), overruled on other grounds by *United States v. Hurtado*, 905 F.2d 74 (5th Cir.1990)).

Finally, to the extent that the district court decision in *United States v. Goldstein* is not otherwise distinguishable, it represents a vestige of pre-*Connelly* jurisprudence that, in any event, is not binding on this court. *United States v. Goldstein*, 611 F.Supp. 626, 631 (N.D. Ill.1985).

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before rendering a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 12th day of May 2016.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE