**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 15-00036 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| BILLY JOE ADCOX | MAGISTRATE JUDGE HAYES |

**MEMORANDUM RULING**

Before the Court is Defendant Billy Joe Adcox's ("Adcox") Motion to Dismiss the Indictment (Record Document 20). The Government opposes Adcox's Motion. See Record Document 22. For the reasons contained in the instant Memorandum Ruling, Adcox's Motion is **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

In this case, Adcox is charged in a two-count indictment with (1) conspiracy to commit securities fraud by insider trading and (2) securities fraud by insider trading.[2] See Record Document 1. The allegations in the indictment revolve around alleged insider trading of shares of stock and options in The Shaw Group, Inc. ("Shaw") prior to a planned acquisition of Shaw by Chicago Bridge and Iron Company, N.V. ("CBI"). See id.

---

[1] In deciding a Motion to Dismiss an indictment, the Court must take all of the facts pleaded in the indictment as true. See United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004). Thus, the facts contained in the "Factual and Procedural Background" section are not findings of fact by the Court, but rather are facts pleaded in the grand jury's indictment that the Court must take as true at this preliminary stage.

[2] Securities fraud is a crime that may take a variety of forms. Insider trading, the act of trading shares of stock in a corporation on the basis of material, nonpublic information about the corporation in violation of a fiduciary duty to that corporation, is but one variety of securities fraud. See 15 U.S.C. §§ 78j(b) and 78ff; see 17 C.F.R. §§ 240.10b-5 and 240.10b5-1. The Court uses the term "securities fraud by insider trading" to clarify that Adcox is charged with this particular variety of securities fraud.

Adcox is a former pharmaceutical sales representative and resident of Ruston, Louisiana. See id. at 1. Adcox is a close friend of Dr. Jesse H. Roberts, III ("Roberts"), a former dentist in Ruston, Louisiana. See id. Roberts is also an experienced trader in stocks and stock options. See id. Roberts' friend and brother-in-law is Scott David Zeringue ("Zeringue"), a former Vice President of Construction Operations for the Plant Services Division of Shaw. See id. John Doe ("Doe") is also a friend of Adcox's who is an experienced trader in stocks and options. See id.

In July 2012, Shaw and CBI were engaged in negotiations for the acquisition of Shaw by CBI. See id. at 2. Shaw was a company based in Baton Rouge, Louisiana, that provided a variety of services for clients in the energy, chemicals, environmental, infrastructure, and emergency response industries. See id. A former competitor of Shaw, CBI is an engineering and construction company in the energy industry. See id. Both Shaw and CBI were listed on the New York Stock Exchange ("NYSE") at that time. See id.

On July 4, 2012, CBI proposed acquiring Shaw for $46 per share in cash and stock. See id. On July 8, 2012, Shaw's Chief Executive Officer advised other high-level officers of Shaw of the acquisition proposal. See id. On July 9, 2012, CBI delivered a written non-binding indication of interest letter to Shaw containing this proposal. See id. On July 15, 2012, Shaw's Board of Directors held a meeting to discuss the proposal in Charlotte, North Carolina. See id. Shaw's management team and legal counsel also attended this meeting. See id. On July 27, 2012, CBI informed Shaw that it had secured financing for the proposed acquisition. See id. The parties finalized the terms of the acquisition on July 29, 2012, and publicly announced the agreement on July 30, 2012. See id.

At some point during the negotiations between Shaw and CBI but prior to the public announcement of the acquisition of Shaw, Zeringue obtained "material non-public information regarding the impending acquisition of Shaw by CBI." Id. As an officer with Shaw, Zeringue owed a fiduciary duty to Shaw to refrain from using such inside information for his personal benefit. See id. at 3. Nonetheless, Zeringue disclosed this inside information to his brother-in-law, Roberts, prior to the public announcement of the acquisition of Shaw. See id. Zeringue informed Roberts that the information was confidential, and made the disclosure to Roberts so that Roberts could make securities trades based upon the inside information. See id.

After obtaining this inside information from Zeringue, Roberts disclosed this information to Adcox and advised Adcox that he should buy shares of Shaw. See id. Adcox asked Roberts about the source of the inside information, and Roberts informed Adcox that Zeringue was the source of the information. See id. Allegedly, Adcox had previously met Zeringue through Adcox's friendship with Roberts, and Adcox knew of both the family relationship between Roberts and Zeringue and the fact that Zeringue was an officer at Shaw. See id. Adcox also allegedly knew that Roberts was buying Shaw securities on the basis of the inside information. See id.

After obtaining this inside information from Roberts, Adcox disclosed this information to John Doe. See id. John Doe asked Adcox about the source of the inside information, and Adcox informed Doe that Zeringue was the original source of the information, with Roberts being the intermediary. See id. Adcox also informed Doe that Zeringue was Roberts' brother-in-law and that Zeringue was an officer at Shaw. See id. Doe wished to speak to Roberts directly, so Adcox put them in touch with one another.

See id. Doe and Roberts had several phone conversations in July 2012 before the public announcement of the acquisition. See id.

Roberts, Adcox, and Doe allegedly knew that the price of Shaw stock would almost certainly rise once the impending acquisition of Shaw became public knowledge. See id. at 4. Therefore, they allegedly engaged in scheme to profit from their possession of this inside information in July 2012 by buying Shaw securities prior to the public announcement of the acquisition of Shaw. See id. Roberts, Adcox, and Doe all purchased both shares of Shaw stock and call options to purchase shares of Shaw stock at a later date at a fixed price prior to the announcement of the acquisition on July 30, 2012. See id. 5-8 (listing the specific date, amount of shares and options purchased, and profits obtained from each transaction).

**LAW AND ANALYSIS**

**I.    Legal Standards**

Federal Rule of Criminal Procedure 7 sets forth the requirements for a federal criminal indictment. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 11(c)(1). Before trial, a criminal defendant may file a motion asserting that an indictment is defective because of, *inter alia*, "lack of specificity" or "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v).

"An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). "It is generally sufficient that

an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence (sic) intended to be punished." Id. (internal quotations omitted). "Undoubtedly the language of the statute may be used in the general description of an offence (sic), but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence (sic), coming under the general description, with which he is charged." Id. (internal quotations omitted).

Though the indictment must at least state the facts and circumstances of the alleged offense such that the accused will be informed of the alleged offense, the indictment does not have to "articulate the evidence that will be used to prove the allegations." United States v. Pratt, 728 F.3d 463, 478 (5th Cir. 2013). "The Constitution requires only enough specificity to allow the defendant to defend against the allegations." Id. In reviewing the sufficiency of the indictment, the Court must take the facts alleged in the indictment as true and determine whether the facts state an offense. See United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004). A review of the sufficiency of an indictment "is governed by practical, not technical considerations." United States v. Rainey, 757 F.3d 234, 247 (5th Cir. 2014).

**II.    Analysis**

Adcox's Motion challenges the indictment on the grounds that it is insufficient under both the Fifth and Sixth Amendments, lacks specificity, and fails to state an offense. See Record Document 20-1; see Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v). Specifically, the parties primarily disagree on the following issues: (1) the proper standard for the

sufficiency of indictments, particularly in the securities fraud by insider trading context; and (2) whether the factual allegations contained in this indictment either (a) allege the elements of the crimes of securities fraud and conspiracy to commit securities fraud at all or (b) are specific enough to meet the minimum standards for an indictment in alleging that Adcox committed these crimes. See Record Documents 20-1 and 22. As stated below, the Court finds that the standards for the sufficiency of an indictment are relatively low, and that the indictment in the instant action meets these standards. Finally, Adcox also makes several weaker arguments that do not alter the Court's conclusion that the indictment is sufficient.

### A. The General Standards for the Sufficiency of an Indictment Are Relatively Lenient.

Citing to Federal Rules of Criminal Procedure 7 and 12 and Russell v. United States, 369 U.S. 749 (1962), Adcox argues that an indictment must include allegations of certain "essential facts" to be minimally sufficient. Record Document 20-1 at 5. Adcox then applies this standard to the indictment, arguing that certain "essential facts" are not present in the indictment and that it should therefore be dismissed. See id. at 6-15. The Government argues that Russell was a case involving a "very unique" alleged crime, and that Russell therefore does not provide the correct general standards for evaluating the sufficiency of an indictment. Record Document 22 at 15. Rather, the Government argues that under other relevant jurisprudence, criminal indictments are held to a relatively low pleading standard. See id. at 1-3.

The Government's argument is correct. Russell involved allegations that several journalists had committed the crime of refusing to answer questions "pertinent to the question then under inquiry" in a congressional subcommittee. See 369 U.S. at 751,

quoting 2 U.S.C. § 192. The Court held that, in the context of this specific crime in which "guilt depends so crucially upon a specific identification of fact," the indictment must identify the subject that was under inquiry in the congressional subcommittee at the time of the alleged offense. See id. at 764. In United States v. Resendiz-Ponce, 549 U.S. 102, 109-110 (2007), the Supreme Court explained that though Russell correctly states that indictments for some crimes must do more than merely "parrot the language of a federal criminal statute," not all crimes fall into that category. Other courts have similarly emphasized that Russell is limited to its facts and other crimes that similarly require detailed factual allegations to provide notice of the nature of the charges to a criminal defendant. See United States v. Kay, 359 F.3d 738, 756-61 (5th Cir. 2004).

Adcox's argument on the basis of Russell is somewhat similar to that made by some commentators. See, e.g., James M. Burnham, Why Don't Courts Dismiss Indictments? A Simple Suggestion for Making Federal Criminal Law a Little Less Lawless, 18 Green Bag 2d 347 (2015) (arguing that because of (1) the similarities between Fed. R. Civ. P. 8(a)(2) and 12(b)(6) and Fed. R. Crim. P. 7(c)(1) and 12(b)(3)(B)(v) and (2) policy reasons, courts should hold the Government to a higher pleading standard in drafting indictments, one that is similar to the federal civil pleading standard). Though there may be some valid arguments for imposing a higher standard for evaluating the sufficiency of indictments, the Court must apply the standards as they currently exist. Thus, the Court finds that the general standards for evaluating the sufficiency of an indictment are those set forth in Section I, *supra*, a relatively lenient set of standards that does not require the heightened fact pleading that the Supreme Court required for the particular crime at issue in Russell.

**B. The Indictment in the Instant Action Neither Fails to State an Offense Nor Lacks Specificity.**

Under the relatively lenient general standards for evaluating the sufficiency of an indictment set forth in Section I, *supra*, the indictment in the instant action is sufficient. The indictment begins with the identification of the people involved in the alleged crimes and a description of the relationships between them. See Record Document 1 at 1-2. Next, the indictment describes the negotiations between Shaw and CBI in July 2012, and alleges that information regarding the acquisition of Shaw was the inside information involved in the alleged crimes. See id. at 2-3. Next, the indictment describes the dissemination of the inside information from Zeringue to Roberts to Adcox to Doe, and it alleges that both Adcox and Doe knew both that Zeringue was the source of the information and that Zeringue was an officer at Shaw. See id. at 3. Finally, the indictment alleges that Adcox, Roberts, and Doe all engaged in a scheme to profit from this inside information by buying Shaw securities before the public announcement of the acquisition of Shaw and selling these securities after the public announcement. See id. at 4. All of these factual allegations are incorporated in both of the indictment's two counts. See id.

    **i.    Count One: Conspiracy Under 18 U.S.C. § 371.**

Count One charges Adcox with the crime of conspiracy to commit securities fraud by insider trading under 18 U.S.C. § 371. See Record Document 1 at 4-8. The elements of a conspiracy under 18 U.S.C. § 371 are:

> (1) an agreement between the defendant and at least one other person to commit another crime;
> (2) the defendant knew of the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and
> (3) that one of the conspirators during the existence of the conspiracy committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy

See Fifth Circuit Pattern Criminal Jury Instruction 2.15A (2015).

The indictment closely tracks these elements. See Record Document 1 at 4-8. The indictment identifies Adcox, Roberts, and Doe as the members of the conspiracy, and alleges that they knowingly and intentionally conspired to commit a specific offense, securities fraud by insider trading. See id. at 4, ¶ 16. It then lists the manner and means of accomplishing the conspiracy, which essentially amounts to a summary of the factual allegations contained in the earlier portions of the indictment plus a statements of the total profits earned by each member of the alleged conspiracy. See id. at 4-5, ¶ 17. Finally, the indictment lists the specific overt acts that members of the conspiracy allegedly committed, listing eighteen purchases and sales of Shaw securities. See id. at 5-8, ¶ 18. Under both the general standards for the sufficiency of an indictment and precedent interpreting those requirements for conspiracy charges, these allegations are sufficient because they track the language of the statute and provide sufficient factual detail to inform Adcox of the specific offense with which he is charged. See Hamling, 418 U.S. at 117; see also United States v. Threadgill, 172 F.3d 357, 367 (5th Cir. 1999) ("a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit").

### ii. Count Two: Securities Fraud by Insider Trading Under 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-1.

Count Two charges Adcox with the crime of securities fraud by insider trading under 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-1. The elements of this crime are that the defendant:

(1) directly or indirectly;

(2) by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange;
(3) willfully used or employed manipulative or deceptive devices or contrivances;
(4) in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement;
(5) in contravention of such rules and regulations as the Securities Exchange Commission ("SEC") may prescribe as necessary or appropriate in the public interest or for the protection of investors.

See 15 U.S.C. §§ 78j(b) and 78ff; see also Ninth Circuit Pattern Criminal Jury Instruction 9.9 (2010).

Sections 240.10b-5 and 240.10b5-1 of Title 17 of the Code of Federal Regulations are regulations promulgated by the SEC under the authority granted to the SEC in 18 U.S.C. § 78j. These regulations provide that the use or employment of a "manipulative or deceptive device or contrivance" under 18 U.S.C.§ 78j(b) includes "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 10b-5(c). More specifically, such a "manipulative or deceptive device or contrivance" under 18 U.S.C. § 78j(b) includes

> the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

17 C.F.R. § 240.10b5-1(a). Such a purchase or sale of a security is made "on the basis of" material nonpublic information "if the person making the purchase or sale was aware of the material nonpublic information." 17 C.F.R. § 240.10b5-1(b).

The indictment closely tracks the statutory elements under 18 U.S.C.§§ 74j(b) and 74ff, and it goes even farther by also tracking the language of 17 C.F.R. §§ 240.10b-5

and 240.10b5-1. First, the indictment tracks the language of 18 U.S.C. §§ 74j(b) and 74ff by alleging all of the elements listed above. See Record Document 1 at 8, ¶ 19. Next, the indictment tracks the language of 17 C.F.R. §§ 240.10b-5 and 240.10b5-1 and specifically alleges that Adcox's purchase and sale of Shaw securities was based upon the inside information regarding the impending acquisition of Shaw that had been disclosed by Zeringue in violation of his fiduciary duty to Shaw. See id. Thus, under the general rules for the sufficiency of indictments, the allegations against Adcox regarding Count Two, securities fraud by insider trading, are also sufficient because they track the language of the statute and provide sufficient factual detail to inform Adcox of the specific offense with which he is charged. See Hamling, 418 U.S. at 117.

### iii. Adcox's Argument Regarding the Sufficiency of an Indictment for Count Two, Securities Fraud by Insider Trading, Is Incorrect.

Adcox argues that, in the specific context of the crime of securities fraud by insider trading, a higher pleading standard than the general pleading standard for indictments applies. Adcox, citing Newman, 773 F.3d 438, 442 (2nd Cir. 2014), argues that an indictment for insider trading against a person receiving a tip like Adcox is only sufficient if it alleges that he both (1) knew that a corporate insider disclosed confidential information and (2) knew that the insider did so for a personal benefit. See Record Document 20-1 at 7-9. In response, the Government argues that (1) Newman is not particularly relevant because it involved a post-conviction review rather than a motion to dismiss an indictment, (2) the Ninth Circuit rejected a portion of the rationale of Newman in United States v. Salman, 792 F.3d 1087 (9th Cir. 2015); and (3) the indictment's allegations are sufficient even if the elements required in Newman are required allegations for insider trading cases.

As discussed in Section II, B, ii, *supra*, one of the elements of the crime of securities fraud by insider trading is that the tipper had a fiduciary duty to a corporation that he broke by disclosing material, nonpublic information to a person who is not entitled to know that information. See 17 C.F.R. § 240.10b5-1(a). Having received even a second-hand tip, a recipient of such a tip like Adcox may then inherit this fiduciary duty under certain circumstances such that he may also be convicted of securities fraud by insider trading. In Dirks, the seminal Supreme Court case for securities fraud by insider trading, the Court held that a recipient of an insider tip inherits the fiduciary duty of the tipper "when the insider [the tipper] has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." 463 U.S. at 660. Breach of a fiduciary duty occurs only when "the insider personally will benefit, directly or indirectly, from his disclosure." Id. at 662. An insider may breach his fiduciary duty when he "makes a gift of confidential information to a trading relative or friend." Id. at 664.

In Newman, the defendant was convicted of securities fraud by insider trading and appealed on the basis that the jury instructions were erroneous. See 773 F.3d at 442-45. Applying Dirks, the Second Circuit held that for a recipient of a tip to inherit the tipper's fiduciary duty such that the recipient can be convicted of securities fraud by insider trading, the Government must prove that the recipient (1) knew that an insider disclosed confidential information and (2) that the insider did so in exchange for a personal benefit. See id. at 442. Controversially, however, in interpreting what is required to show a "personal benefit," the court held as follows:

> to the extent Dirks suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's

trades resemble trading by the insider himself followed by a gift of the profits to the recipient, we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature.

Id. at 452 (internal citations and quotations omitted).

In Salman, the defendant argued on the basis of this language that his conviction should be reversed because the Government had not put forth any evidence of an exchange of a tangible pecuniary benefit to the tipper for the tip from the recipient of the tip. See 792 F.3d at 1093. The Ninth Circuit rejected this argument. See id. The court pointed out that even the opinion in Newman was unclear as to whether proof of such a tangible pecuniary benefit to the tipper was required, as the Newman court also stated that "personal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*, . . . the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." Id. at 1093-94, quoting Newman, 773 F.3d at 452. Thus, in Salman, the Ninth Circuit stated that to the extent that Newman could be read to require evidence of some actual pecuniary benefit to the tipper, the Ninth Circuit declined to follow this requirement because it found such a requirement inconsistent with Dirks. Id.

After the completion of briefing on the instant Motion, the Supreme Court issued its opinion in Salman v. United States, 137 S. Ct. 420 (2016). In Salman, the Supreme Court agreed with the Ninth Circuit's interpretation of Dirks, stating that "to the extent the Second Circuit [in Newman] held that the tipper must also receive something of a pecuniary or similarly valuable nature in exchange for a gift to family or friends . . . we agree with the Ninth Circuit that this requirement is inconsistent with Dirks." 137 S. Ct. at 428. This means that to prove a breach of fiduciary duty by the tipper, the Government

may merely prove (1) a close relationship between the tipper and a trading relative or friend and (2) that the tipper provided this relative or friend with confidential information as a gift. See id. The rationale for this rule is that proof of such a gift is essentially the same thing as if the tipper were to trade based on the information on his own and give the profits of the trade to the recipient as a gift. See id. Thus, to the extent that Adcox argues that Newman requires an indictment for securities fraud by insider trading to contain specific allegations regarding the receipt of a pecuniary benefit by the tipper in exchange for the tip, that argument is foreclosed by the Supreme Court's decision in Salman, and the indictment cannot be dismissed on that basis.

In the instant action, the indictment alleges that Zeringue (the tipper) was Roberts' (the recipient or tippee) friend and brother-in-law. See Record Document 1 at 1, ¶ 3. It then alleges that Adcox received the inside information from Roberts after Zeringue disclosed this information to Roberts. See id. at 3, ¶ 11. Further, the indictment alleges that Adcox personally knew Zeringue, that Adcox knew of Zeringue's position as an officer at Shaw, and that Adcox knew that the inside information that he received from Roberts had originally come from Zeringue. See id. These allegations, taken as true, are enough to constitute a personal benefit to Zeringue from Roberts in exchange for the tip, as such a personal benefit may be inferred when there is evidence of (1) a close relationship between the tipper and a trading relative and (2) that the tipper provided this relative or friend with confidential information as a gift. See Salman, 137 S. Ct. at 428. Thus, the indictment sufficiently alleges that Adcox committed the crime of securities fraud by insider trading despite Adcox's argument that an allegation of an actual pecuniary benefit to Zeringue is required to render the indictment sufficient.

### C. Adcox's Remaining Arguments Do Not Alter the Court's Conclusion That the Indictment Is Sufficient.

In addition to the arguments discussed in Section II, A and B, *supra*, Adcox also makes several weaker arguments. First, he argues that Adcox cannot be held criminally liable for merely trading on material nonpublic information. See Record Document 20-1 at 9-10. This argument, though it states a correct general legal principle in securities fraud cases, does not require the Court to dismiss the indictment. See Dirks, 463 U.S. at 658-59 (holding that "recipients of inside information do not invariably acquire a duty to disclose [that they possess such information] or abstain [from trading based on such information]").

In the instant action, the Government alleges far more than that Adcox simply acquired material nonpublic information about Shaw and traded on that information. Rather, the Government has alleged all of the factual allegations contained in the Factual and Procedural Background Section, *supra*, and discussed in detail in addressing the sufficiency of the indictment in Section II, A and B, *supra*, including allegations that Adcox knew of the connection between Roberts and Zeringue, personally knew Zeringue, and knew that Zeringue obtained the information by virtue of his employment with Shaw. See Record Document 1; see Dirks, 463 U.S. at 658-59 (though not all recipients of inside information are barred from trading on that information, "the need for a ban on some tippee trading is clear," such as for a tippee who receives inside information from someone he knows or should know is an insider who breached the insider's fiduciary duty to the corporation). Thus, the mere fact that acquiring material nonpublic information and trading based on that information is not a crime in itself is an irrelevant fact in deciding the instant Motion, as the indictment alleges much more.

Second, Adcox argues that the indictment fails to allege that Zeringue had a fiduciary duty to Shaw that Zeringue breached by disclosing material nonpublic information to Roberts and then to Adcox. See Record Document 20-1 at 10-11. Rather, Adcox argues that Zeringue obtained his information, if any, about the potential acquisition of Shaw from mere rumors and gossip from other Shaw employees and officers rather than "by reason of [his] position within" Shaw. Id., quoting Newman, 773 F.3d at 445. According to Adcox, reciting the conclusion that Zeringue received inside information "in the course of his duties as a Shaw officer" is insufficient, particularly because Zeringue's position as Vice President of Construction Operations in Shaw's Plant Services Division would not have provided him with direct access to such inside information. Id. at 10.

However, Adcox does not cite any authority for the proposition that a securities fraud indictment is insufficient because it fails to detail the exact job duties of the tipper and the precise method by which the tipper obtained the inside information at issue. See id. at 10-11. Nor does Adcox cite any authority stating that inside information must derive from the specific job duties of the tipper. See id. In fact, the authority to which Adcox cites states that such information must merely be obtained "by reason of his position within" the corporation, indicating that an indictment is sufficient if it alleges facts from which a jury could conclude that Zeringue would not have obtained the information but-for his position as an officer within Shaw. Newman, 773 F.3d at 445. Adcox's argument on this point also involves a factual contention: that Zeringue's position within Shaw, though an officer position, was not one which entitled him to direct involvement in discussions regarding the acquisition of Shaw or imposed a fiduciary duty upon him to refrain from

disclosing such information. The Court may not resolve such factual questions at this procedural stage, as the sole question before the Court in deciding the instant Motion is the sufficiency of the indictment. See Kay, 359 F.3d at 742 (the Court must take factual allegations in the indictment as true at the Motion to Dismiss stage). Thus, the Court rejects this argument as well.

Third, Adcox argues that the indictment fails to adequately allege that Adcox acted with the requisite mens rea to be held criminally liable for securities fraud. See Record Document 20-1 at 11-12. Specifically, Adcox argues that the indictment fails to sufficiently allege that Adcox committed securities fraud "willfully," as 15 U.S.C. § 78ff(a) "requires a realization on the defendant's part that he was doing a wrongful act under the securities laws." Id. at 11. Adcox further argues that the indictment "is wholly devoid of any allegations that Adcox knew or should have known that his conduct was a violation of the federal securities laws." Id.

This argument seems to heighten the burden the Government must prove in a securities fraud case to a burden of proving that Adcox acted with specific intent to violate the law. However, "proof of a specific intent to violate the law is not necessary to uphold a conviction under [15 U.S.C. § 78ff(a)], provided that satisfactory proof is established that the defendant intended to commit the act prohibited." United States v. Schwartz, 464 F.2d 499, 509 (2nd Cir. 1972). "A person can willfully violate an SEC rule even if he does not know of its existence," and Adcox may be found to have acted willfully if the Government "establishes a realization on [Adcox's] part that he was doing a wrongful act." United States v. Peltz, 433 F.2d 48, 55-56 (2nd Cir. 1970). Thus, under a definition of "willful" that does not require proof of specific intent to violate the law, the indictment in

the instant action alleges both (1) that Adcox acted willfully and (2) facts that, if adduced at trial, would constitute circumstantial evidence from which a jury could infer that Adcox acted willfully. See Record Document 1 at 1-8 (factual allegations against Adcox and alleged purchases and sales of securities); see also United States v. Rodriguez, 132 F.3d 208, 212-213 (5th Cir. 1997) (even when "willfully" has been interpreted to require actual knowledge of the law in the context of a different crime, circumstantial evidence of such knowledge is sufficient to justify a jury's conclusion that a defendant had such knowledge). The Court therefore rejects Adcox's argument regarding the alleged insufficiency of the indictment's mens rea allegations.

## CONCLUSION

The general standards for the sufficiency of an indictment are relatively lenient. The Court finds that with respect to both Counts One and Two of the indictment in the instant action, the indictment meets the minimum requirements under both the United States Constitution and the Federal Rules of Criminal Procedure.

Therefore, Defendant Adcox's Motion to Dismiss the Indictment (Record Document 20) is **DENIED**.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, on this the 7th day of June, 2017.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE